# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| ENERGY DATA RESOURCES, LLC., | |
| Plaintiff/Counter Defendant, | No. C23-61-LTS-MAR |
| vs. | |
| EMERSON ELECTRIC CO. and EMERSON AUTOMATION SOLUTIONS, FINAL CONTROL US LP, | **MEMORANDUM OPINION AND ORDER** |
| Defendants/Counter Claimants. | |

## I.    INTRODUCTION

This case is before me on cross motions for partial summary judgment. Defendants Emerson Electric Co. (Emerson Electric) and Emerson Automation Solutions Final Control US LP (Emerson Automation) (collectively, Emerson) have filed a motion (Doc. 25) for partial summary judgment as to their first counterclaim (Count I - breach of contract) and summary judgment in its entirety as to its second counterclaim (Count II - conversion). Plaintiff Energy Data Resources, LLC (EDR), has filed a resistance (Doc. 26) and Emerson has filed a reply (Doc. 30).

In addition, EDR has filed a motion (Doc. 24) for partial summary judgment on the limited issue of liability as to its own breach of contract claim. Emerson has filed a resistance (Doc. 29) and EDR has filed a reply (Doc. 31). Also before me is EDR's motion (Doc. 28) to strike Emerson's appendix in support of its motion for partial summary judgment. Emerson has filed a resistance (Doc. 33) and EDR has filed a reply (Doc. 34). Oral argument is not necessary. *See* Local Rule 7(c).

## II.    PROCEDURAL HISTORY

On June 22, 2023, EDR commenced an action against Emerson in the Iowa District Court for Linn County.  Doc. 1-1.  On August 1, 2023, Emerson removed the case to this court based on diversity jurisdiction under 28 U.S.C. § 1332.  *See* Doc. 1.  EDR asserts claims for breach of contract (Count I) and, in the alternative, unjust enrichment (Count II).  Emerson filed an answer (Doc. 6) denying the claims and asserting counterclaims for breach of contract (Count I), conversion (Count II) and fraudulent inducement (Count III).  EDR filed an answer (Doc. 12) to the counterclaims.  Trial is scheduled to begin January 6, 2025.

## III.    APPLICABLE STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the substantive law will identify which facts are material."  *Id*.  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not.  *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question."  *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).  Evidence

2

that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996). On cross motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A

3

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998).

## IV. RELEVANT FACTS

### A. EDR's Motion

EDR and Emerson Automation entered into a Client Energy Services Agreement-Extension (the Contract) dated October 1, 2018. Doc. 29-1 at 1. Pursuant to the Contract, EDR agreed to provide two categories of services to Emerson Automation in exchange for payment – utility bill payment services (Bill Pay) and data collection services. *Id.*; Doc. 31-2 at 1. Paragraph 2.1(b) addresses the Bill Pay services and provides that EDR would pay utility invoices of certain Emerson Automation facilities using funds provided by Emerson Automation. Doc. 31-2 at 2. Paragraph 2.1(a) addresses the data collection services and provides that EDR would process utility bills for certain facilities listed in Attachment A[1] to the Contract and then store those utility bills, and information contained therein, in EDR's electronic database. *Id.* Section 2.2(a) of the Contract provides:

> Client shall sign a letter substantially in the form attached to this Agreement as Attachment B (or otherwise required by a Utility supplier) authorizing EDR to negotiate on Client's behalf on account matters, billing disputes and errors, tax exemption status, historical data, and other information general in nature. The contracting parties to each agreement for the supply of Utilities for the Facilities shall be Client and the appropriate Utility supplier.

---

[1] The parties have been unable to locate and produce Attachment A. EDR alleges that this is because Emerson's representative, Erik Hoffman, was tasked with generating it and failed to do so despite EDR providing him the information he needed. Doc. 31-2 at 2. The parties dispute what facilities would have appeared on Attachment A, with Emerson believing there were 50 different Emerson facilities, with most being located outside the United States, and EDR believing most were located within the United States. *Id.* at 2-3.

4

Doc. 29-1 at 2. The parties amended the Contract on multiple occasions, including Addendum 1, which added Emerson Electric as a party to the Contract and specifically identified and applied to 24 facilities in Texas. *Id.* at 3. Addendum 2 specifically identified and applied to 29 facilities in Ohio. Consistent with Section 2.2(a) of the Contract, Emerson executed multiple letters authorizing EDR to act on Emerson's behalf. *Id.* Effective April 5, 2021, Emerson Electric executed a Limited Agency Agreement, pursuant to which Emerson Electric gave EDR authority to discuss and receive data related to Emerson for an additional period of four years. *Id.* at 4.

In 2018, EDR began performing data collection services under the Contract for Emerson. *Id.* The parties dispute the extent to which EDR provided monthly invoices to Emerson for its services. Emerson states that EDR has produced only 12 monthly invoices for data collection services from November 2018 through November 2022. *Id.* In any event, Emerson paid the monthly invoices without issue until July 2022. *Id.* at 5. The parties dispute what happened at that time. EDR states Emerson ceased making any payments to EDR. Emerson admits that is true with respect to EDR invoices, but states that it kept submitting funds to EDR for Bill Pay use. *Id.* The parties dispute whether Emerson has failed to pay EDR for all the data collection services that EDR has provided. Emerson denies any outstanding balance, stating the services allegedly rendered were outside the scope of the Contract and/or not properly charged under the Contract.

According to Emerson, from 2018 through mid-2021, EDR's monthly fees for its services under the Contract, including data collection, typically totaled around $2,500. EDR disputes this, noting its monthly fees were typically over $2,500 and did not average around that amount. Doc. 31-2 at 3. Emerson states this changed in mid-2021 when EDR's bills drastically increased. EDR disputes this, noting that it billed what it was entitled to charge under the Contract and the fees increased over time as a natural consequence of Emerson asking EDR to service more of Emerson's sites. *Id.* In September 2021, EDR's bill totaled $13,791.50. *Id.* at 4. In July 2022, the bill totaled $47,418.75. *Id.* Emerson contends this increase in fees coincided with EDR's

5

integration of utility invoice data from an entity known as CASS Information Systems (CASS). *Id.* EDR disputes this, stating there was never any integration of utility data from CASS into the global database Emerson asked EDR to create. *Id.*

The parties agree Emerson timely paid all of EDR's bills until July 2022. Emerson contends it refused to pay any further EDR bills until it received an adequate explanation of EDR's charges. *Id.* at 5. EDR disputes this communication was ever made and notes that its invoices have always had the same structure and format. *Id.* Emerson states the bills do not identify which Emerson utility account and facility had been serviced or what types of invoices (historical or current) had been processed for said utility/account. *Id.* at 6. Emerson states the bill simply provided the number of accounts that had been opened for a given country and the number of invoices that had been processed for a given country. Again, EDR notes that the structure and formatting of its invoices remained consistent throughout its relationship with Emerson and Emerson never asked for them to be changed. *Id.* The parties dispute whether the invoices are consistent with industry standards. *Id.* at 7.

On October 27, 2022, EDR owner John Weber sent an email to Emerson stating:

As all of you should be aware EDR has been attempting to get our monthly service invoices paid since July 2022 with no success. Due to this non-payment we are stopping data entry and other services in full as of 10/31/22, access to the Data Site was blocked as of October 19th 2022.

*Id.* EDR then commenced its state court action on July 11, 2023, seeking $89,302 in damages for four unpaid bills dated August 1, 2022 ($30,416); September 1, 2022 ($29,882); October 1, 2022 ($25,181.25); and November 1, 2022 ($3,822.75). *Id.* at 7-8. Emerson's counterclaims seek $210,625.20 for unauthorized charges on bills from June 2021 through July 2022. These counterclaims are based on alleged charges to Emerson for allegedly integrating CASS data, which EDR disputes. *Id.* at 8.

Emerson explains that it operates hundreds of facilities throughout the world, each with one or multiple utility accounts. *Id.* Emerson had used CASS to provide Bill Pay

services for hundreds of utility accounts for Emerson facilities based in the United States. *Id.* EDR notes that CASS was not servicing all of Emerson's United States facilities, as Emerson asked EDR to service facilities where CASS was not operating. *Id.* Sometime prior to July 2021, Weber suggested Emerson place utility data for all of Emerson's facilities into EDR's data system, not just the ones covered by the Contract, to create a global central database for Emerson utility accounts. *Id.* at 8-9. The parties dispute how they agreed to proceed. Emerson states it agreed to a "pilot project type of approach" that would allow it to see the value in housing all of its data with EDR's system before making a final decision, which would have involved a significant expansion of the Contract. *Id.* at 9.

EDR states it never proposed or agreed to a "free pilot program" of a global database. It states Emerson asked it to do procurement work in Texas, which EDR agreed to do on condition that it would need to do data management and upload the data into EDR's data system. According to EDR, Emerson understood and agreed to pay for those services. EDR asserts that Emerson was pleased with the work EDR did in Texas, asked EDR to do similar work in Ohio and then in Europe. EDR states its work did not include uploading CASS data into the global database and that it informed Emerson that CASS data could not be integrated into EDR's system because it was "riddled with inaccuracies and errors." *Id.* at 9-10. Emerson's understanding is that the parties agreed to move forward with a pilot project in which EDR would take all of the United States utility data housed in CASS' system and electronically transfer that data into EDR's system. Emerson relies on the deposition testimony of its employee, Richard DeYoung, who explained:

> [T]he expectation would be that they would be able to connect electronically to CASS and to bring data over to their system and then we could combine it with EDR data outside the US to build sort of just a consolidated data warehouse.
> . . .
> It was a sort of a no-cost pilot to determine, you know, if EDR could do it, what would that data look like in their system, you know, what kind of

7

reports and analytics could we have, and if it had gone well, the data would have been there. It would have been hosted and we would have started reporting and then we would have begun evaluating how to add the rest of the world, in terms of scope, to their system.

*Id.* at 10. Emerson states with this expectation, it gave EDR direct access to its data in the CASS system to allow for the electronic data integration. This occurred in July 2021, which Emerson asserts is precisely when the costs for EDR's services drastically increased. *Id.* at 11. Emerson insists that the CASS data integration occurred, it was not done free of charge as contemplated by the parties and that the parties never amended the Contract to add the CASS facilities. EDR maintains that the CASS integration never occurred because there was never a plan for the integration to occur.

EDR relies on Weber's deposition testimony that the CASS data integration project was cancelled without any data taken from CASS and that EDR instead moved forward obtaining all the United States-based utility data directly from each utility company rather than from the centralized CASS database. *Id.* at 12. Weber also testified that Emerson authorized this manual data collection effort and agreed to be charged pursuant to Paragraphs 4.1 and 4.2 of the Contract. Emerson relies, in part, on the deposition testimony of EDR employee Jennifer Kreel that EDR had successfully integrated all of Emerson's utility data housed in CASS. *Id.* at 13. EDR maintains that it did not integrate utility data from CASS. Emerson asserts, based on Kreel's deposition, that EDR directly contacted certain utility companies only when the CASS data was missing. It also relies on an analysis done by DeYoung demonstrating that utility invoices found in EDR's data system were obtained directly from CASS. *Id.* at 14. Emerson maintains that the CASS issue is critical to this lawsuit because 76 to 82 percent of all accounts in the EDR system were also in the CASS system, meaning that the vast majority of charges by EDR related to information EDR obtained from CASS. *Id.*

The parties agree that EDR's services should allow Emerson to be able to analyze its energy output, needs and spending by housing a significant quantity of its utility data

in one centralized system that allows for analytic capabilities. *Id.* at 15. As such, EDR obtained current and ongoing utility invoice data on a month-to-month basis but also acquired historical billing data to increase the total dataset. *Id.* With regard to historical invoicing, Paragraph 4.2(a) of the Contract provides that EDR would process 12 months of historical invoices for an account and that the charge for this service would be included in the $75.00 start-up fee for the account if the historical invoices were "furnished to EDR" by Emerson. *Id.* at 16. Paragraph 4.2(b) states that if the historical invoices were not furnished by Emerson and "not available in electronic format from the respective utilities," then EDR will charge "$50.00 per hour for cost to gather historic billing information." *Id.*

The parties dispute whether the Contract provided a flat per invoice charge of $8.90 or $10.25. *Id.* The parties also dispute whether Weber has admitted to charging Emerson this flat rate for historical invoices even though it is reserved for current invoice processing. *Id.* They agree that Weber testified he and DeYoung had an oral conversation in which they agreed to amend the Contract such that EDR could charge for historical invoices at the current invoice rate. *Id.* However, Emerson denies that conversation ever occurred or that DeYoung would have had the authority to alter the Contract in that way. *Id.* at 17. The parties agree the Contract explicitly states that any amendments to the Contract must be made in writing and signed by both parties. *Id.*

Emerson asserts EDR did not keep track of how many of its charges were related to processing of historical invoices and is unable to identify how many of the charges at issue relate to historical invoices. EDR states this information could have been made available, but Emerson never requested it. Emerson estimates that it has paid EDR $136,791.94 in fees for the processing of historical invoices, all of which should have been done free of charge. EDR disputes this stating it never promised to do these services free of charge. Emerson estimates that 82 percent of its outstanding bills relate to fees for historical invoices.

9

Emerson's position is that it agreed to pay for data collection services with respect to only 50 facilities. EDR's position is that Emerson agreed to pay EDR for all the work EDR did at Emerson's facilities, which includes data collection services with respect to significantly more facilities. The parties apparently attempted to reach some understanding, as they agree Emerson requested a detailed breakdown of the fees contained in the four EDR bills that form the basis of EDR's breach of contract claim. However, EDR states that Emerson never responded to or approved the first draft recreated invoice and that it was waiting for direction and approval from Emerson to continue the work, which never came. As such, it appears that only a partial breakdown for one of those invoices (August 2022) has been completed. Emerson states it conducted its own analysis of this invoice totaling $30,416 in fees and concluded (1) $24,768.25 of the fees related to Emerson utility accounts were also saved in the CASS database and (2) $26,634.25 of the fees in that invoice relate to charges for the processing of historical invoices. Once the overlap between those two groups is removed, Emerson asserts that the total is $27,413.25, and therefore disputes 90 percent of the fees in the August 2022 invoice. EDR disputes Emerson's analysis by simply stating there are no outstanding amounts it owes to Emerson.

**B.      *Emerson's Motion***

The parties agree they entered into the Contract with an effective date of October 1, 2018, and it obligated EDR to perform data collection and bill pay services. Doc. 26-2 at 3-4. The paragraph dealing with "Bill Pay" provided:

> On the Beginning Bill Date, EDR shall commence paying Utility Charges set forth on each of Client's Utility Bills received by EDR to the applicable Utility supplier on behalf of Client. EDR shall only pay each such Utility Bill if Client has previously paid EDR the amounts associated with such Utility Bill and any and all fees due under this Agreement prior to the time that each such Utility Bill is due. Client shall be solely responsible for any and all late fees, penalties or charges assessed against Client by a utility company due to Client's failure to pay EDR all undisputed amounts when

10

due under this Agreement. EDR shall be responsible for any and all late fees, penalties or charges assessed against Client by a utility company due to EDR's failure to pay all undisputed amounts when due under this Agreement.

*Id*. at 4. Emerson states that in practice, EDR would issue a "Funds Request," which would list, amongst other things, utility bills that were coming due for Emerson facilities that were receiving EDR's Bill Pay services and the total amount for Emerson to pay. *Id*. EDR disputes that it issued a document titled "Funds Request" and states that it would issue a flat file in the form of an Excel spreadsheet. *Id*. Emerson would then submit a payment to EDR for the amount requested. EDR would use those funds to pay the utility bills listed in the "Funds Request" or Excel spreadsheet. *Id*. at 5.

In summer 2022, a dispute arose in which EDR claimed to be owed for outstanding invoices. Emerson states that at the time of Weber's October 27, 2022, email stating that EDR was stopping all services as of October 31, 2022, EDR was in possession (and continues to be in possession) of $121,464.14 in funds transmitted to EDR by Emerson for purposes of Bill Pay that were not actually used for Bill Pay due to the termination of the parties' relationship. EDR admits that it is currently holding $121,464.13 in funds it received from Emerson but states it originally tried to contact Emerson about returning the funds and Emerson did not respond. *Id*. at 6. Weber testified that EDR made multiple attempts to return the $121,464.14, but Emerson failed to provide the requisite banking information for EDR to transmit the money. *Id*. EDR adds that it had concerns with returning the funds to Emerson because Emerson has changed the amount it believes should be returned on several occasions.

On June 8, 2023, Emerson's counsel sent EDR's counsel the requisite banking information.[2] *Id*. at 7. Weber testified that EDR was holding onto the money for settlement purposes based on its belief that Emerson owes EDR an even greater sum and

---

[2] EDR argues this statement of facts is based off inadmissible settlement communications under Federal Rule of Evidence 408 and is the subject of its motion to strike discussed below.

based on Emerson's inconsistent statements regarding the amount of Bill Pay funds EDR is allegedly holding. EDR admits Emerson demanded a return of the funds, but states the demand was in an amount exceeding what was actually provided to EDR. *Id.* at 8-9.

## V. DISCUSSION

### A. *Motion to Strike Appendix*

Pursuant to Federal Rule of Evidence 408, EDR moves to strike three letters from Emerson's appendix in support of its motion for partial summary judgment, arguing that they contain settlement correspondence between the parties. Emerson does not dispute striking two of those letters, at Emerson Appendix 63-66 and 67-68. Therefore, the dispute is limited to the correspondence at Emerson Appendix 240-42, which is a letter from Emerson's attorney to EDR's attorney dated June 8, 2023, in which Emerson provided its banking information so EDR could return Emerson's Bill Pay funds.

Emerson argues this letter is in response to EDR's assertion that it was unable to return Emerson's funds because it lacked Emerson's banking information. Because the letter is being offered to prove that EDR had knowledge of Emerson's banking information sufficient to return Emerson's money, Emerson argues it falls within an exception to Rule 408(a). It argues the letter is also relevant to establish EDR's undue delay in returning Emerson's funds and disprove any assertion that EDR's failure to return the funds was caused by Emerson's delay in providing banking information.

EDR argues that if the letter was offered for the sole purpose of evidence that Emerson provided its banking information to EDR, then all other portions of the letter should be struck as containing inadmissible settlement discussions.

Rule 408 provides:

(a) Prohibited Uses. Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

(1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or a statement made during compromise negotiations about the claim--except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

(b) Exceptions. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408.

Because Emerson is offering this evidence to demonstrate EDR's knowledge of Emerson's banking information, and to negate a contention of undue delay in providing such information to EDR, I find that it is admissible under Rule 408(b). I will consider this evidence only as to those purposes. As such, the motion to strike is denied as to the June 8, 2023, letter at Emerson Appendix 240-42 and granted as to the letters at pages 63 to 68 of Emerson's Appendix.

## B. *Emerson's Motion*

Emerson seeks summary judgment on Count I (breach of contract) and Count II (conversion) of its counterclaims arising out of the Bill Pay service under the Contract.[3] Emerson contends that in October 2022, EDR informed Emerson that it was stopping all services as of October 31, 2022. At this time, Emerson had already submitted $121,464.14 to EDR for Bill Pay purposes. EDR refused to return the funds. Emerson

---

[3] Specifically, Emerson seeks partial summary judgment as to Count I (which also seeks damages unrelated to the Bill Pay funds) and summary judgment in its entirety as to Count II (relating solely to the withheld Bill Pay funds).

argues EDR has acted in bad faith, entitling Emerson to an award of attorney fees.

EDR argues there are genuine issues of material fact as to who is entitled to the $121,464.14 currently held by EDR and as to the extent of Emerson's damages. It also argues that any entry of final judgment on Emerson's claims should be reserved for trial based on EDR's affirmative defense of recoupment, which could result in deduction or complete bar to Emerson's recovery. EDR also argues that Emerson's request for common law attorney fees should be denied.

To prevail on a breach of contract claim under Iowa law,[4] a plaintiff must prove:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [plaintiff] has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa-Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)). A party breaches a contract when, without legal excuse, the party fails to perform any promise that forms a whole or a part of the contract. *Id.* (citing *Magnusson Agency v. Public Entity Nat'l Co. Midwest*, 560 N.W.2d 20, 27 (Iowa 1997)).

The Iowa Supreme Court defines conversion as "the wrongful control or dominion over another's property contrary to that person's possessory right to the property." *Blackford v. Prairie Meadows Racetrack & Casino, Inc.*, 778 N.W.2d 184, 188 (Iowa 2010). "The essential elements of conversion are (1) ownership by the plaintiff or other possessory right in the plaintiff greater than that of the defendant; (2) exercise of dominion or control over chattels by defendant inconsistent with, and in derogation of, plaintiff's possessory rights thereto; and (3) damage to plaintiff." *Matter of Estate of Bearbower*, 426 N.W.2d 392, 394 (Iowa 1988) (citations omitted).

---

[4] Neither party contends that the law of any other state applies in this diversity action.

On the breach of contract counterclaim, EDR argues there is a genuine issue of material fact as to Emerson's alleged damages, noting that Emerson relies on the value of the held funds as identified by EDR but has failed to support that amount with any accounting or financial testimony or documents. EDR contends that its admissions of the amount of held funds, and what it believes it received the held funds for (utility Bill Pay), are insufficient as EDR has not admitted that the funds belong to Emerson. EDR notes that Emerson has provided various damages figures throughout litigation but, as to the current figure of $121,464.14 on which it now agrees, has failed to provide any sort of accounting or financial testimony or documents to support that amount. EDR argues there is also a genuine issue of material fact regarding who has right or ownership over the held funds, suggesting that the utility companies may have a right or interest in them. It argues that Emerson has also not provided any evidence demonstrating that Emerson is the rightful owner.

Emerson argues no accounting, financial testimony or documents are necessary to support its calculation of damages since EDR has admitted to possessing $121,464.14 in withheld Bill Pay funds it received from Emerson. Emerson argues that its previous allegations of damages are immaterial as it has agreed to the amount of Bill Pay funds admitted by EDR and, as such, the amount is undisputed. Additionally, Emerson argues that it need not prove that other parties not subject to the Contract (such as utility companies) are not entitled to the funds, especially because no utility companies have made a claim to the Bill Pay funds. With regard to EDR's recoupment defense, the court has denied EDR's request to amend its answer to assert that defense. *See* Doc. 41.

Because EDR is not permitted to pursue its affirmative defense of recoupment, *see* Doc. 41, the only issues are (1) whether there is a genuine issue of material fact as to who owns the $121,464.14 held by EDR and the amount of Emerson's damages and (2) whether Emerson is entitled to attorney fees. EDR raises no other challenge to Emerson's motion. *See* Doc. 26-1 at 1. Based on the record before me, I conclude Emerson is entitled to partial summary judgment on its breach of contract counterclaim and summary

15

judgment in its entirety on its conversion counterclaim. It is undisputed that EDR retains possession of $121,464.14 that was submitted by Emerson to EDR for Bill Pay purposes but was not utilized for that purpose. *See* Doc. 26-2 at ¶ 21 ("EDR admits it is currently holding $121,464.13 in funds it received from Emerson."). EDR's assertion that Emerson may not be the rightful owner is disingenuous given that it admits the funds came from Emerson. Whether Emerson owes any utility companies is between Emerson and those companies and in no way gives EDR a legal right to hold Emerson's funds, absent some provision in the Contract that would allow for such action. EDR's other reasons for holding the funds are equally unpersuasive. EDR's purported damages on its own breach of contract claim has no effect on the merits of Emerson's claims. In addition, Emerson need not prove up the amount of funds given that it agrees with and accepts EDR's admission as to the amount it is holding. *See* Fed. R. Civ. P. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."). Because it is undisputed that the $121,464.14 held by EDR belongs to Emerson, Emerson's motion for partial summary judgment on its breach of contract counterclaim and full summary judgment on its conversion claim will be granted.

Emerson argues an award of attorney fees is appropriate in this case because EDR's continued withholding of funds has been done in bad faith. It notes that EDR has never raised the argument that the funds may belong to utility companies but has instead claimed that it "tried unsuccessfully on several occasions to return the funds." Doc. 25-3 at 134. When asked to elaborate on this in his deposition, Weber stated that Emerson had failed to provide banking information. *Id.* at 161. When confronted with evidence that EDR had provided its banking information on June 8, 2023, *see id.* at 242-44, Weber responded it had not yet returned the money because it was "holding onto it for settlement" stating its position that Emerson owed EDR a greater sum of money. *Id.* at 162-163.

"Generally, attorney fees are recoverable only by statute or under a contract." *Miller v. Rohling*, 720 N.W.2d 562, 573 (Iowa 2006). "A written contract must contain an express provision regarding attorney fees and litigation expenses in a favorable judgment." *NevadaCare, Inc. v. Iowa Dep't of Human Servs.*, 783 N.W.2d 459, 470 (Iowa 2010). In the absence of such a provision, Iowa generally follows the American rule in which parties pay their own attorney fees. *See Goche v. WMG, L.C.*, 970 N.W.2d 860, 863 (Iowa 2022). One exception to this general rule is known as common law attorney fees, which may be awarded only when a party's behavior is "extraordinarily culpable." *UE Local 893/IUP v. State*, 997 N.W.2d 1, 15 (Iowa 2023) (citing *Hockenburg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines*, 510 N.W.2d 153, 158-60 (Iowa 1993)). The Iowa Supreme Court has described the level of culpability as exceeding the kind of "willful and wanton disregard that permits an award of punitive damages," and rising to the "level of oppression or connivance to harass or injure another." *Id.* It envisions "conduct that is intentional and likely to be aggravated by cruel and tyrannical motives." *Id.* Unlike the federal standard, "[m]ore than mere bad faith is required" to obtain fees under Iowa law. *UE Local 893/IUP*, 997 N.W.2d at 16 (quoting *Thornton v. Am. Interstate Ins.*, 897 N.W.2d 445, 475 (Iowa 2017)).

EDR argues that its conduct does not rise to the level of culpability to justify an exception to the general rule that each party bears their own legal fees. It states that it originally attempted to contact Emerson in the fall of 2022 to return the held funds and when it did not receive an immediate response and as the parties' dispute grew, it became concerned about its own liability to utility companies who were supposed to receive the funds. It also blames Emerson for creating uncertainty by changing the value of funds it believed EDR was allegedly withholding.

Here, the Contract contains no express provision regarding attorney fees or litigation expenses. Even viewing the facts in the light most favorable to Emerson, EDR's conduct could be seen as willful and displaying a certain degree of vexatiousness, but does not rise to the high level required to overcome the general rule on attorney fees. As

17

such, Emerson's motion as to attorney fees will be denied.

## C.    *EDR's Motion*

EDR seeks partial summary judgment on (1) Emerson's breach of contract counterclaim, to the extent Emerson attempts to claw back payments made by Emerson for data procurement services provided by EDR, and (2) EDR's breach of contract claim on the issue of liability.  Essentially, it argues that it performed as required under the contract and is entitled to the payments made by Emerson and subsequent payments that Emerson failed to make.

Emerson argues that EDR has breached the contract and that EDR's motion presents multiple fact issues for a jury to resolve.  Emerson identifies those fact issues as: (1) the number of Emerson facilities that EDR was authorized to provide data collection services for in exchange for payment and (2) the manner in which EDR was authorized to bill Emerson with respect to the processing of historical utility invoices. Emerson contends that EDR's position relies on an oral amendment to the Contract, which explicitly requires amendments to be in writing.  Emerson explains that it seeks to recover over $200,000 in unauthorized fees that it has already paid.

Emerson contends that around July 2021, the parties agreed orally to a pilot project, free of charge, in which EDR would demonstrate the value of creating a central repository of all Emerson's data using data that was stored with CASS.  Emerson identifies numerous disputes with regard to this purported pilot project, including whether the electronic data transfer from CASS ever occurred or to what extent, whether Emerson agreed that EDR could move forward with the project obtaining data from all the U.S.-based utility companies directly (rather than from the CASS database) and whether it agreed to be charged for this manual data collection effort pursuant to Paragraphs 4.1 and 4.2 of the Contract.  Emerson argues the dispute over how much data was transferred from CASS is material because 76 to 82 percent of all accounts in the EDR system were also in the CASS system, suggesting that the vast majority of charges by EDR related to

18

invoices that EDR obtained from CASS.

Emerson also argues that EDR's charges for processing historical invoices are in contravention of the Contract. It relies on expert testimony that one customary approach for historical invoice processing (and embraced by the Contract) is to incorporate the historical invoice processing into the start-up fee charged for the creation of a new utility account in the service prover's system. Emerson cites Paragraph 4.2 of the Contract, which provides in subsection (a) that EDR will process 12 months of historical invoices (or more if EDR requests) for an account and that the charge for this service will be included in the $75.00 start-up fee for the account if the historical invoices are "furnished to EDR" by Emerson. Subsection (b) provides that if the historical invoices are not furnished by Emerson and "not available in electronic format from the respective utilities" then EDR will charge "$50.00 per hour for cost to gather historic billing information[.]" Doc. 29 at 11-12. Emerson argues that despite these contractual terms, EDR charged Emerson for each historical invoice at a flat per invoice rate of $8.90 reserved for current invoice processing. In addition, Emerson argues EDR did not track how many of its charges were related to processing historical invoices such that EDR cannot identify how many of the charges at issue relate to historical invoices. Emerson estimates it has paid EDR $136,791.94 in fees for processing historical invoices, all of which should have been done free of charge pursuant to Paragraph 4.1(a) of the Contract.

Emerson states it made multiple requests in July 2022 for information regarding the basis for EDR's charges. It contends it was provided only a partial breakdown for one of EDR's bills (dated August 1, 2022) and that EDR has chosen not to provide a breakdown for the three remaining bills for which it seeks payment. Based on the August 1, 2022, invoices seeking $30,416 in fees, Emerson has concluded that (1) $24,768.25 of the fees contained in the invoice relate to Emerson utility accounts that were also saved in the CASS database and (2) $26,634.25 of the fees relate to charges for the processing of historical invoices. Once the overlap is removed, $27,413.25 of the fees in that invoice are associated either with invoices from CASS or historical invoices and thus, Emerson

19

disputes 90 percent of the fees in the August 2022 invoice and suspects that other bills are made up of similar charges.

As noted above, to prevail on a breach of contract claim under Iowa law, a plaintiff must prove:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [plaintiff] has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co.*, 578 N.W.2d at 224 (citing *Iowa-Illinois Gas & Elec. Co.*, 497 N.W.2d at 825). A party breaches a contract when, without legal excuse, the party fails to perform any promise that forms a whole or a part of the contract. *Id.* (citing *Magnusson Agency*, 560 N.W.2d at 27).

With regard to Emerson's breach of contract counterclaim, Emerson argues it has presented sufficient evidence to demonstrate a material factual dispute as to whether EDR breached the Contract by charging for services not authorized by Emerson or the Contract. It notes this evidence of overcharging consists of utility invoice data from CASS, which was not supposed to be billed by EDR and that EDR charged a flat per-invoice fee from the processing of historical invoices, which directly contradicts the written Contract.

With regard to EDR's breach of contract claim, Emerson argues there is a question of material fact regarding (1) whether EDR's outstanding fees are authorized by the contract and (2) whether EDR's charging of allegedly excessive and unauthorized fees constitutes a material breach discharging Emerson from its contractual obligations. Emerson notes that EDR's motion is based on the monthly invoices from August 2022 through November 2022, totaling $89,302.00. Emerson contests roughly $80,371.00 of those fees based on the CASS database and historical invoice pricing, among other reasons. Emerson argues a jury should determine whether EDR's charges were authorized by the Contract or otherwise before concluding whether Emerson breached

the Contract by failing to pay for those charges.

EDR argues that the bulk of Emerson's arguments are about damages, which are not at issue in its motion. It notes that Emerson contests only how much it was charged for the services, not whether the contracted-for services were provided as required under the Contract. With regard to whether Emerson was excused from its payment obligation under the Contract, EDR argues Emerson must prove there was a material breach by EDR. Section 6.2 of the Contract details what constitutes a material default, which includes when a party "(a) materially fails to comply with the terms and conditions of this Agreement and, after receiving written notice describing such failure from the other party, has failed to cure such failure within twenty (20) days" and "(b) fails to make payment due within ten (10) business days after having received written notice to cure the deficiency." Doc. 31 at 3. EDR argues that because Emerson failed to provide EDR a written notice of default, Emerson's material breach defense fails as a matter of law and Emerson's payment obligation was never excused.

Emerson's dispute is not limited to damages but concerns EDR's performance under the Contract as to how it billed for certain services and whether it was authorized to perform those services. The Contract details EDR's compensation as follows:

> **4.2    Start-Up Fee**.   On the first invoice submitted pursuant to this Section, Client shall pay the sum of $75.00 per account that is set up in the EDR data system. Set up includes but is not limited to the following: Once EDR receives from a client a clear copy of the most recent bill for each account to be processed EDR will be responsible for contacting the respective utilities to have the invoice re-directed to EDR. All historical information for each account will be uploaded in the EDR system. Development of an agreed upon GL download format will be worked on with client. Text files will be generated and testing of the banking system flow will take place. Training (both individual and group via WebEx will be offered to all Emerson, Inc. staff that it is determined will need access to the EDR data system. This training is ongoing and allowed whenever requested and also when new staff need to be introduced.
>
> a)    Multiplied by the total number of Utility accounts for which EDR will be processing Utility Bills. Initial startup fee shall include twelve

21

months of historical utility bill data as furnished to EDR by Client or more if requested.

       b)     Client shall pay EDR $50.00 per hour for cost to gather historic billing information not provided by client and not available in electronic format from the respective utilities and for any other agreed upon tasks.

*See* Doc. 29-3 at 18. Emerson has provided some evidence that EDR charged a per-invoice fee for the processing of historical invoices, even though the Contract authorizes $50.00 per hour for gathering historical invoices and no fee for historical invoices that are obtained from Emerson.[5] *See* Doc. 29-2 at 25. There is also a question of fact as to whether there was an oral modification to the Contract. *See* Doc. 29-2 at 27 (in which Weber explains that because Emerson was not able to provide 12 months of historical utility bill data to EDR, EDR had to obtain it directly from the utility companies and because that resulted in a lot of work for EDR, the parties agreed it was more cost effective for Emerson to pay the flat fee as opposed to hours worked).

       In short, there are numerous factual disputes for a jury to resolve that go beyond damages, including the number of facilities on which EDR was authorized to collect data, what it was authorized to bill and whether its billing exceeded that authorization such that there could be a material breach. In other words, the issue is not merely whether EDR performed data collection services. Those services had to be provided consistent with what the parties contemplated in the Contract. The same is true for the billing of those services. Emerson has demonstrated there are disputed facts as to these issues. As such, EDR is not entitled to summary judgment on Emerson's breach of contract counterclaim to the extent Emerson attempts to claw back payments for data procurement services and EDR's breach of contract claim on liability.

---

[5] Emerson argues that because it has submitted evidence that EDR obtained much of this data from CASS, the processing of historical fees should have been done at no extra cost to Emerson. *See* Doc. 29 at 16, n.6.

## VI. CONCLUSION

For the reasons stated herein:

1.       EDR's motion (Doc. 28) to strike Emerson's Appendix is **granted in part and denied in part**.  It is **granted** as to Emerson Appendix pages 63 to 68, which are hereby **stricken**.  It is **denied** as to Emerson Appendix pages 242 to 244.

2.       Emerson's motion (Doc. 25) for partial summary judgment as to Count I and summary judgment in its entirety as to Count II of its counterclaims is **granted in part and denied in part**.  Summary judgment is **granted** in Emerson's favor on that portion of Count I of Emerson's counterclaim in which Emerson contends that EDR breached the Contract by withholding $121,464.14 in Bill Pay funds.  Summary judgment is also **granted** in Emerson's favor as to Count II of Emerson's counterclaim (conversion).  Emerson's request for an award of attorney fees is **denied**.

3.       EDR's motion (Doc. 24) for partial summary judgment is **denied**.

4.       This case shall proceed to trial on all of EDR's claims, on the remaining portion of Count I of Emerson's counterclaim (relating to data procurement services) and on Count III of Emerson's counterclaim.

**IT IS SO ORDERED** this 5th day of November, 2024.

_____
Leonard T. Strand
United States District Judge